Morning, Your Honors. Morning. George Belfield of Greenberg-Trarig for the Owen-Susteen, Inc. reserves some time for the race judicata argument at the end. This, I don't believe, is a case of first impression like Seeley. I think this case should be analyzed according to normal contract terms. What we have here is not a franchise case where you have those potentially unconscionable one-sided contracts or the concerns that the court had in Seeley. You have a license case. You have a case where there are two relatively sophisticated parties who negotiate a minimum royalty. It's known risk. It's certain. It meets all the standards for contract damages. In fact, it's more enforceable than a liquidated damages clause because Sourcenext, in effect, controls how much money they owe under the minimum royalty. If they go out and sell the goods, the minimum royalty decreases, their risk decreases. So it's just as enforceable as a liquidated damages clause and is, in fact, commercially more reasonable. This is also different than the franchise case because the parties foresaw that there might be problems, and they put a cure provision in there. So there's a 60-day cure provision. If either side has a problem with the contract, you identify the problem to the other side, and you have the opportunity to cure and fix it. That's what happened here. My client identified the problem, gave them the 60 days to cure, and we find out later, for economic reasons, there was no response. It's also different for a third reason, because unlike the Seeley case, there was a breach that didn't involve the mere payment of money. If you can ever say the mere nonpayment of money, it's not a substantial breach. This was a breach of a fundamental principle of intellectual property law that really didn't even have to be in the contract because it's the law anyway. You're not allowed to go out and use the licensed software for uses that were not authorized. That's what SourceNext did in this case. So from my mind, from my standpoint, it's not really a Seeley case. And I think Judge Wilson analyzed it the same way. And Judge Wilson, after I had filed the brief, came out the same way I think I came out. So I didn't convince Judge Carter, but I think I might have convinced Judge Wilson. And I believe that this is not a Seeley case, that this is a normal contract case. It's a negotiated risk. I'm not out here. And I didn't understand the reference to Judge Wilson and Judge Carter. Was Judge Wilson the judge originally and then was stretched for Judge Carter? No. Judge Carter was the judge below, who I inartfully failed to convince. Right. Judge Wilson, since the briefs in the Radisson Hotel case, has analyzed a franchise or a franchise agreement in the same way and has distinguished Seeley in the same way that I have. So you actually have a split in the district courts below on this issue. I think Judge Wilson got it right. I think that you do not want to send a message to the IP community in a case like this. Is there a citation to that district court case? Yes, Your Honor. I filed on Friday of last week a ---- You're right. I have that. And I attached a copy of the case. I have it. And I also attached just for your broad reference a franchise law journal article from last summer that recognizes the same problem with the Seeley case and a couple of other cases. And I admit, it's written by Pillsbury Winthrop. It's written by franchise lawyers. So it has that bent on it. But if you look at that, you'll see the type of issues that are being raised. And I just want to point out, Your Honor, there's a lot of law, including statutes in California, that are particular to the franchise or franchise relationship. That's a touchy relationship. It's not what we're talking about here. We're talking about pretty normal intellectual property license agreements. And I really don't think the court wants to set a precedent in this case and tell IP lawyers and clients that these types of minimum royalties that are negotiated are not enforceable in this context. And I think that that summarizes my position fairly well, and I'd like to reserve time for the race-judicata argument. Okay. We'll move to Mr. Porter. Good morning, Your Honors. Good morning. John Porter of Paul Hastings, Janofsky & Walker, on behalf of the appellee in this case, SourceNext Corporation. And in my comments this morning, I'm going to try and briefly address the two independent and alternative grounds for affirming the judgment below. The first is the grounds that the district court relied on, which is essentially the rule from not only the Seeley case, but as well the Fagel and Tate case, which is a license case, licensee case, from 1931, the Fagel case, that was then In this case, if your view of the law is correct, then what the ‑‑ what Susteen had to do was to, in order to get the full benefit of the contract, was to notify your client of the breach, but continue to allow them to use the software as long as they paid the royalties. And then what? Then sue them for breach for sublicensing? Which they, in fact, did in Japan. I mean, they had many alternatives. So that's a yes, right? Yes. Well, it was one of their many alternatives. What they had to do in order to continue earning the royalties was not terminate the contract. Because without the ‑‑ without the use of the license, there's nothing from which a royalty would be owed. Essentially, you're ‑‑ Right. It's very similar to the Adler case, which is a California Supreme Court case. And what it says, what the Adler case said in its holding was you don't get to pretend, on the one hand, that the contract is still in effect in order to get the benefits of the contract, which to Susteen was the compensation, the royalties. But on the other hand, treat it as being terminated because you wanted to preclude source of ‑‑ But I want to follow up with this. So what was the damage? But there is, aside from any copyright issue litigated in Japan, but there was a breach here as well because the same obligation was in the contract. There was an alleged breach, and for purposes of ‑‑ All right. Okay. What are the damages for that breach if, in fact, the licenses, the license fees were being paid on those subcontracted use of software, as I understand it. But that wasn't the allegation. The allegation isn't that they weren't paying on it. The allegation was we don't want this software out there being used by somebody else, and that was part of the deal, right? So what was the damages for that? You have one primary right, which is the alleged ‑‑ I'm not talking about ‑‑ No, I know. But it answers your question because it depends on which legal theory you pursue. You can pursue a copyright theory or you can pursue a breach of contract theory. What would the damages be if the license fees were paid for not ‑‑ for the subcontracting, sublicensing? Well, fees weren't ‑‑ Sustein alleged no fees were paid for the sublicensing. Oh, I see. So I presume ‑‑ So it would be the fees. Yeah. They would say you owe us the fees or you owe us your profits. But the actual breach wasn't the paying of the fees or the nonpaying of the fees. It was the subcontract ‑‑ the sublicensing wasn't supposed to go on whether you paid the fees or didn't pay the fees. That's their allegation. What Sourcenext was paying for, and they agree we were paying for, was the authorized use. What the licensing agreement authorized Sourcenext to do with the software, Sourcenext paid for. They agree we paid for it. What they allege is we breached the licensing agreement. By doing unauthorized things also. Correct. For that, you're saying they should have pursued damages and injunctive relief, but not termination of the contract, if they wanted to continue to receive the minimum penalties. Exactly. I have a question that is perhaps vague, but I want to raise it anyway. There are some cases that suggest that this contract perhaps ought to be construed under Japanese law, and nobody has argued that or briefed it, so your answer may be, who cares, nobody raised it. But ‑‑ Actually, that issue was raised. So it's been waived at this point, though, because that's not an argument on appeal. Correct. It was raised in connection with the Form 9 convenience motion, and our point was we're not clear what they're alleging, but if they're alleging Japanese law controls, they ought to be litigating this in Japan, not in the United States. Well, something can be litigated here, and the law to be applied to a contract can still be the law of a foreign country. The argument below was the California law governed. Okay. So I shouldn't worry about it, is what you're telling me. Yes. Okay. That's good, because I don't know anything about Japanese law. So, you know, what I would point out, though, is there are a lot of arguments that have been made, and I want to address the Radisson Hotel decision, because I believe respectfully that Judge Wilson did not get it right. Where he first went wrong is he misperceived the role of the federal courts in applying California law, and the Ninth Circuit in the Martinez case, I think, said it best, which is it's not the role of the federal courts to decide what California law should be. It's the role of the federal courts to decide, to look at what California law is. And, in fact, the Ninth Circuit authorities that we cited in our brief state that the federal courts must follow California Court of Appeal decisions on issues of California state law unless there's convincing evidence that the California Supreme Court would not follow the decisions of the California Court of Appeal and come to a different conclusion. And there's been no evidence of that in this case. And I think if you look at it, there's not competing California State Court of Appeal decisions. You have the Seeley case in 1996. You have the Fagel and Tate decision in 1931. They both follow general principles of California law. The district court referenced those in cases of termination. Those cases were not addressed at all by Sustein in either its moving papers or its reply briefs, that when you terminate a contract, the termination of the contract abrogates whatever obligations of the parties that accrue after termination. You don't get to pretend like the contract is still in effect. Judge Wilson in the Radisson Hotel case, in dicta, by the way, said he thought Seeley was mistaken, and since it wasn't a California court of appeal, he didn't need to follow it. That's not a correct statement of the law. But that was the case. But Radisson ultimately turned on a specific provision of the Radisson contract. Which is very, very important. The specific provision in the Radisson contract said explicitly that if Radisson terminates the contract, there's a liquidated damage provision, and it set out a formula that applied. It's important to contrast that with our case and the licensing agreement in our case, a copy of which is attached to the complaint. I believe it's around page 10 of the excerpt, something like 14. Right. And what I would point out to the Court is that Article 10 of the licensing agreement, which is on the excerpts of record, page 17, specifies exactly what provisions of this licensing agreement survive termination of the contract. And it says it's in Article 10-2. Yeah. It says 9, 7, 8, 9, 12, and 13. The article that set forth the compensation is Article 4. It's not one of the provisions that the parties agreed would survive termination. To go back to where I started, I've just looked at the complaint again, and it doesn't seem to allege that there was a – that the problem was that they were not getting paid on the sublicensed use. So I'm still mystified by that. In other words, I had understood this case as being essentially about the fact that paid or not paid, we have an agreement that you're not going to be sublicensing these other entities, and we don't authorize you to do so, and that you did so, and that the payment is sort of beside the point whether you pay for it or don't pay for it. And that's why I'm having trouble seeing how, if my understanding is correct, how a post-termination loss or how the scenario of not terminating but suing for breach would have made them whole. Because they're essentially two different issues. I mean, and I think it directly relates to the proximate cause issue, which is whether they get paid for the authorized use, which they concede they were getting paid up until the time of termination. They were getting paid. But I actually read this as at least not negating the notion that they might have been getting paid for the unauthorized use, too, but they still didn't want it to happen because it was unauthorized. Well, factually, I don't think that's accurate. Mr. Bellfield can address that. But it's not in the complaint, at least. Okay. But their complaint was you shouldn't be sublicensing the software. Okay. Not that you aren't paying us for the authorized use. Right. Or the unauthorized use. They weren't complaining about not getting paid at all. The claim, though, that survives in this case is you haven't paid us the royalties after termination of the contract. I understand that. I'm trying to understand how, if my understanding of their problem is correct, they could have, in fact, remedied their problem in the manner that you say they should have, i.e., by not terminating the contract and suing for breaches as they occurred, because I don't know what the suit for breach, how they would have proved damages for their breach, assuming that I'm right, that it wasn't that you weren't paying on it. What would the damages have been and how would that have remedied their problem It depends whether they assert a copyright claim in Japan. No, they weren't going to assert it. Even if they asserted a copyright claim in Japan, they were also asserting a breach of the contract for the sublicensing. Well, yeah, but you have to make an election of remedies. That gets to our Couldn't they still sue for injunctive relief and continue under the contract? Yes. Exactly. They have multiple remedies available to them. They get to make some choices. They could file a suit and say you're breaching the contract and we want injunctive relief that says in joining you from sublicensing the software. We're not terminating the license agreement. We seek an injunction against you, sublicensing the software, and we seek damages that were approximately caused. I'm sure you'd have expert testimony. Maybe one method they would do is we'd say how many units did you sublicense and what's the appropriate royalty rate or damage figure that should be applied for the number of units you improperly sublicensed. And there would be a damage calculation. The damage calculation for that would have nothing to do with the minimum royalties due under the license agreement for authorized uses. But they have remedies available to them. And, in fact, they did file a lawsuit in Japan for copyright infringement, which is one of the remedies that was available to them. My time is almost up, and I briefly want to touch on the res judicata and just Where's the privity with respect to that litigation? Okay, they're clearly related. What Sustene and AMI, American Megatrends Incorporated Japan, alleged is that they co-owned the software, they co-developed it. There was a written assignment agreement from Sustene to American Megatrends in connection with the litigation in Japan. That's part of the record. I can get you the site if you need that. But it's in the brief. There's a written assignment agreement that allowed American Megatrends to bring the action in Japan, asserting rights of both Sustene and American Megatrends. Mr. Moriyama, the president of both American Megatrends and Sustene, signed that assignment agreement on behalf of both entities. He actively participated in the litigation in Japan, the president of Sustene and the president of American Megatrends. So clearly when you look at the test, which is, is there a sufficient unity of interest that they ought to be considered one entity for purposes of privity, that existed here. Mr. Belfield in front of this court conceded that they were affiliated entities, which they clearly are. Mr. Moriyama, at the time of the litigation in Japan, owned close to 100% of both entities. They were commonly owned, commonly controlled. And there was an express written assignment agreement, constituting privity under any definition. There was also a suggestion in the reply brief that we didn't have a final judgment on the merits. But under California law, a judgment by consent or settlement does constitute a final judgment on the merits for purposes of res judicata. That issue was raised in the reply brief. And so the side I would give is the Vickta v. Merrill Norman Cosmetics, 19, 4, 454, pages 460 and 461. Witkin also talks about it in Summary of California Procedure on Judgments at Section 315, that a judgment by consent or settlement constitutes a final judgment on the merits for purposes of res judicata. Thank you, Your Honors. Thank you. We have considerable rebuttal time. Before I get to the res judicata argument, there's another way of looking at it that I think helps the perspective. When my client entered into the contract, they negotiated a minimum royalty. That was the negotiated risk. And you could think of it as the minimum royalty was earned on that day. My client would not have given them the rights to use the software if they hadn't committed to the minimum royalty, because unlike a franchisee agreement, we're relying on SourceNext in Japan in a different company to do the marketing, to do all of the efforts that are necessary to earn the royalty. So we earned the royalty of $2.5 million. It was just a question of whether they were going to sell enough goods that they didn't have to pay it or whether they were going to owe it to us at the end. So in that sense, that goes to the... Except it isn't a liquidated damages clause. That's true. It's a minimum royalty. That's right. Which is different. And there's payment each month, performance reports each month... Right. ...suggesting that it has to be ongoing for you to earn the minimum or more. Right. Unless they materially breach. So you're right. At the end of two years, you tally up and whatever the minimum royalty minus the actual royalties is what they would still owe, as long as they didn't breach. If they start using that goods for some other purpose, which they did, they've breached, and the minimum royalty is already earned. That's a risk that was negotiated... That's what I don't see in the contract. I don't see anywhere where it refers to it as a liquidated damages clause or requires that it be all prepaid, if you will, upon breach, the way you would have to prepay a mortgage or something like that. It doesn't exist. You're clearly right. It's not a liquidated damages clause per se. From a commercial perspective, it is more favorable to them than a liquidated damages clause because they have the ability to decrease... But you're asking us to read it as one. I'm not really saying that. You're asking us to read it as a clause that either provides liquidated damages or causes everything to be due upon breach, and that's not in the agreement either. No, I don't. I'm certainly saying that liquidated damages are analogous, and when you look at it and you apply reasonableness tests and that stuff's analogous. But it's not. It is a minimum royalty. On the day that my client said you can use the software for that specific purpose, they owed us the minimum royalty. If they decided, which they did, that they didn't want to use the product, they still owed the minimum royalty, and that's what happened. And did they – is counsel correct that they did pay you the minimum royalty until – or the amount that they owed for the authorized use up until the time of the termination? Then it's in the record. Is that a yes? That's a yes. Okay. And then it's in the record that for their own reasons, they stopped because they didn't need the product anymore. And absent the unauthorized use breach, there is no doubt they owed the rest of the royalty. No, but they stopped because you terminated the – my understanding is that you terminated the contract. Your allegation is they would have stopped essentially, but they actually stopped because you terminated it. That's true. But it is also uncontroverted in the evidence that that is the reason that they terminated. And that's the reason they didn't respond to you. But you terminated. They didn't terminate. We terminated. I'm sorry. I'm confused. You terminated because they weren't – because they were sublicensing when they weren't supposed to. That really isn't related to the other point, which is that they had substitute software. That's right. You're essentially saying they wouldn't have paid anyway, but that's not what happened. That's just counterfactual. Right. If they hadn't – if we hadn't discovered the unauthorized uses, the record is undisputed that they would have stopped selling the software product anyway, and they would have therefore owed us the minimum royalty anyway. The only thing that happened is we discovered the unauthorized use. So we sent the cure letter, gave them 60 days for them to respond however they wanted. They ignored it for their own reasons, and then we terminated the contract. That is, I think there's no dispute that we were allowed to do. You're making kind of a – the argument that we have in a completely different area of the law with respect to what would have happened if what happened didn't happen. That is – right? I mean, that's essentially the argument, that it wouldn't have mattered anyway. If, in fact, you had done what you were supposed to do, the same thing would have turned out. That's right. I think the end result was going to be the same. Is there any authority for the application of that rule in the contract context? Not that I'm aware of. Counsel, let me ask you about the other issue, and that is the district court's analysis of the primary right as being different under California law, which since I can ignore Japanese law, I understand California law to have – to focus on the primary right in the litigation and their protection of the copyright versus getting your money for having given them use. How are those the same primary right? You're right, Your Honor, and you can also ignore the federal transactional analysis because we're all in agreement. Okay. So how are those the same primary right? As I have studied the primary right rule and as I understand it, the best way to say it is, were there two different injuries? That's what the California courts have ultimately come down to. And, yes, there's two different injuries. There's the royalties and the $2.5 million minimum that they committed to for the authorized uses. And then there's a totally different primary right. They did the bundling with Toshiba and Hitachi, and they violated the copyright laws. In fact, our contract, when we say you're not allowed to go sublicense, that's not even really necessary when you think about it in a contract because that's the law anyway. If you enter into a contract for royalties and you give them software and they go use the software somewhere else in an unauthorized manner, you don't need a contract to say you're not allowed to do that. And that's true whether they pay you or don't pay you for that use. I'm sorry, Your Honor? And that's true whether they pay you or don't pay you for that use. That's right. That's right. It's one of the standards. It's a copyright standard, this time under Japanese rule, that was litigated there. It's a contract standard under California law that was litigated here. And to touch briefly on the other race judicata arguments, you know, that case got settled in Japan. That's right. And that is a final judgment in the sense that apparently akin to CCP 664.6, they entered the settlement on the record so it can be enforceable. But even in California, that's not enough for race judicata. You need a judgment on the merits on the issue that is actually being litigated in the California case. And we didn't get a judgment on the merits in Japan. We got a settlement. And the record is undisputed that the issue of the California contractual dispute was raised in Japan and specifically not resolved as part of the settlement. So I don't think they meet any of the elements for race judicata. The ‑‑ it wasn't a judgment on the merits. The claims are certainly not identical. As we just explained, you have a copyright claim for unauthorized use, and you've got a breach of contract claim for the authorized uses. They're two different primary rights. And as to whether the parties are identical, it's true. I've admitted that they're related. But it's not my burden of proof to establish identity for race judicata purposes. It's their burden of proof. And I don't find anything, looking at the record in the last couple weeks, that they prove that. So I think race judicata is not an issue. Judge Carter should be affirmed on that basis, and he should be reversed on the contract basis. And because there's no issue of fact, I think he can send it back to Judge Carter. Because when I entered the judgment in here, I waived all the fraud claims and everything else. I said, forget it. We're not going to go to trial on that. Let's go to the Ninth Circuit. Let's find out what they think about the primary issue. There's no real disputed facts about that primary issue. And I think he should send it back to Judge Carter and tell him to enter judgment for the $1.5 million. Thank you. Thank you, counsel. The case just argued is submitted. We appreciate the arguments of both counsel, which is quite interesting. And we will stand adjourned. All rise. The Court is adjourned.
judges: Hall, Graber, Berzon